# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

| | |
|---|---|
| **PETERS BROADCAST ENGINEERING, INC.,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **Case No. 1:21-cv-00219-HAB-SLC** |
| **v.** ) | |
| ) | |
| **PEM CONSULTING GROUP, LLC,** *et al.*, ) | |
| ) | |
| **Defendants.** | |

## REPORT AND RECOMMENDATION

Before the Court is a motion to dismiss and a supporting memorandum filed by Defendants PEM Consulting Group, LLC ("PEM"), Pyramid Consultants & Construction, LLC ("Pyramid"), and Phillip E. Miller (together, the "Defendants")[1] pursuant to Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6), asking that the Court dismiss Plaintiff Peters Broadcast Engineering, Inc.'s ("PBE") claims in Counts I-VI of the complaint. (ECF 45, 46). Plaintiff timely filed a response brief in opposition to the motion (ECF 49), and Defendants timely filed a reply (ECF 55), making the matter ripe for adjudication. PBE subsequently filed a motion asking to supplement its response brief with an exhibit. (ECF 61, 61-1). Defendants have not filed a response to the motion to supplement, and their time to do so has now passed. N.D. Ind. L.R. 7-1(d).

The District Judge referred this matter to the undersigned Magistrate Judge for a report and recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule 72-1. (ECF 81). For the following reasons, I recommend that Plaintiff's motion for leave to file a supplement to its

---

[1] There are two other Defendants in this case, namely, Atlantic Casualty Insurance Company and Chesapeake insurance, however those Defendants will be addressed as "Atlantic" and "Chesapeake," respectively.

response (ECF 61) be DENIED. I further recommend that Defendants' motion to dismiss (ECF 45) be GRANTED as to Counts I through V under Rule 12(b)(6) but DENIED as to Count VI under Rule 12(b)(1), and that Plaintiff be given leave to file an amended complaint.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff initiated this lawsuit on June 3, 2021 (ECF 2), and its complaint alleges, in relevant part, the following:

On May 21, 2019, Plaintiff, a telecommunications engineering company, obtained a "multimillion dollar contract" ("Crown agreement") to perform communications tower construction services at cell tower sites for Crown Castle ("Crown project"). (*Id.* ¶¶ 4, 12, 19). PEM, a so-called subcontractor, approached Plaintiff and offered to provide subcontractor services for the Crown project upon learning of the Crown agreement. (*Id.* ¶¶ 23-24). PEM, along with Pyramid and Miller, represented in various communications that, if Plaintiff would sign a subcontractor agreement with them, they would provide labor, materials, supervision on the Crown project, resources, and funds. (*Id.* ¶ 25). According to Plaintiff, those promises were falsely made to induce it to enter into a subcontractor agreement with Defendants, though they knew they had no intentions—and could not—fulfill the promises, as they were not qualified and did not have the resources or funds. (*Id.* ¶¶ 21, 24, 26). PEM further promised it would execute a contract with Atlantic and Chesapeake, PEM's general liability insurers, to fulfill the subcontractor requirements in the Crown agreement. (*Id.* ¶¶ 8, 25). "On information and belief," Plaintiff was made a loss payee and additional insured on the general insurance policies issued to PEM by Atlantic and Chesapeake. (*Id.* ¶ 62).

Without signing an agreement, but on reliance on PEM's promises, Plaintiff began delegating work to PEM on certain Crown project sites. (*Id.* ¶ 27). Subsequently, PEM sought to

formalize the agreement by sending a proposed subcontractor agreement, which Plaintiff refused as it was "wholly unacceptable" and against the representations Defendants had previously made to Plaintiff. (*Id.* ¶¶ 28-29). Instead, the parties entered into an oral agreement pending execution of a satisfactory written agreement. (*Id.* ¶ 30). Pursuant to the oral agreement, under which PEM would fulfill certain subcontractor specifications "structured to meet Crown Castle's requirements," Plaintiff made several payments totaling $35,000 over the course of three months to PEM. (*Id.* ¶¶ 30, 31). However, PEM did not fulfill the requirements of their oral agreement, for example by failing the pay the Crown project workers—which Plaintiff "was forced to pay"—and insisting on signing the agreement Plaintiff had already rejected. (*Id.* ¶ 32). PEM's refusal to enter into the requisite agreement, compounded by the failure to pay the construction crew, led to the project's standstill. (*Id.* ¶ 34). Ultimately, Crown Castle terminated the Crown agreement and Plaintiff lost any present and future opportunities to do business with Crown Castle. (*Id.* ¶¶ 34, 63).

As a result, Plaintiff filed suit, claiming that Defendants operated a "sham entity." (*Id.* at 2). In the seven-count complaint, Plaintiff asserts a federal claim under the Racketeer Influenced and Corrupt Organizations ("RICO") Act and state-law claims against Defendants in Counts I through VI, and a declaratory judgment action against Atlantic and Chesapeake in Count VII, seeking that they both provide insurance coverage to Plaintiff for the liabilities and damages owed by Defendants. (*Id.*; *id.* ¶ 67).

Plaintiff seeks compensatory and punitive damages, interests, costs, attorney's fees, an "[o]rder that the corporate entity of PEM and Pyramid be disregarded and their members and shareholders made personally liable," a declaration that Defendants Atlantic and Chesapeake are

"required to and obligated to provide insurance coverage" for the Defendants' alleged liability, and any other relief or award the Court deems appropriate. (*Id.* at 18).

Defendants filed the instant motion, moving to dismiss the complaint for failure to state a claim for which relief may be granted under Fed. R. Civ. P. 12(b)(6) and lack of subject-matter jurisdiction under Fed. R. Civ. P. 12(b)(1). (ECF 45, 46). Plaintiff also filed a motion for leave to file a supplement to its opposition brief, seeking leave to supplement its opposition brief with an affidavit and documents supporting its claims. (ECF 61).

## II. LEGAL STANDARD

### A. Rule 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of a complaint, or any portion of a complaint, for failure to state a claim upon which relief can be granted. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation and internal quotation marks omitted); *see also Ray v. City of Chi.*, 629 F.3d 660, 662-63 (7th Cir. 2011) (citation omitted) ("While the federal pleading standard is quite forgiving, . . . the complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." (citation and internal quotation marks omitted)). A plaintiff is required to include allegations in the complaint that "plausibly suggest that the plaintiff has a right to relief, raising that possibility above a 'speculative level'" and "if they do not, the plaintiff pleads itself out of court." *E.E.O.C. v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 569 n.14 (2007)). When a party moves to dismiss a claim under Rule 12(b)(6), the factual allegations in the complaint must be

accepted as true and read in the light most favorable to the nonmovant. *Brokaw v. Mercer Cnty.*, 235 F.3d 1000, 1006 (7th Cir. 2000).

## B. *Rule 12(b)(1)*

A court has subject-matter jurisdiction if it has federal question jurisdiction under 28 U.S.C. § 1331 or diversity jurisdiction under 28 U.S.C. § 1332. Federal jurisdiction is satisfied if a case arises "under the Constitution, laws, or treaties of the United States," 28 U.S.C. § 1331, whereas diversity jurisdiction is satisfied when the parties are diverse and the case involves an amount in controversy exceeding $75,000, *id.* § 1332. The party seeking to invoke federal diversity jurisdiction bears the burden of demonstrating that the requirement of complete diversity has been met. *Chase v. Shop 'N Save Warehouse Foods, Inc.*, 110 F.3d 424, 427 (7th Cir. 1997). Subject-matter jurisdiction is not a waivable defense, and as such, the parties or the Court can raise the issue of lack of subject-matter jurisdiction at any time during the proceedings. Fed. R. Civ. P. 12(h)(3); *Gaunce v. deVincentis*, 708 F.2d 1290, 1291 (7th Cir. 1983).

## III. ANALYSIS

### A. *Motion to Supplement*

I begin with a review of Plaintiff's motion for leave to file a supplement to its opposition brief (ECF 61). In the motion, Plaintiff offers an affidavit of Brandon Draper, Esq., Assistant General Counsel Harris County District Attorney's Office, Houston, Texas, and reports of an investigation of Defendants led by Harris County officers in Texas to supplement its allegations in the complaint. (ECF 61, 61-1). Plaintiff states that the supplemented information bolsters its claim that an enterprise exists under the RICO Act, that Defendants misappropriated Plaintiff's name and goodwill, that the amount in controversy is met, and that Plaintiff lost the Crown

agreement due to Miller's tortious interference with Plaintiff's and Crown Castle's business relationship. (ECF 61 at 5). Plaintiff further states that "at the time of filing Opposition[,] PBE had not received a response to the subpoena issued to the Sheriff's Office of Harris County, Texas . . . ." (*Id.* at 4).

"When ruling on a motion to dismiss, the court may consider documents . . . attached to the complaint, documents . . . central to the complaint and . . . referred to in it, and information that is properly subject to judicial notice." *Amin Ijbara Equity Corp. v. Vill. of Oak Lawn*, 860 F.3d 489, 493 (7th Cir. 2017) (alterations in original) (citation and internal quotation marks omitted). "If, on a motion under Rule 12(b)(6) . . . , matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d); *see United States ex rel. Howze v. Sleep Ctrs. of Fort Wayne, LLC*, No. 1:11-cv-00035-JD-SLC, 2017 WL 652179, at *5 (N.D. Ind. Feb. 1, 2017) ("[P]leadings . . . include the complaint, the answer, and any written instruments attached as exhibits." (citing Fed. R. Civ. P. 10(c))); *Burlington Ins. Co. v. Phillips-Garrett, Inc.*, 37 F. Supp. 3d 1005, 1010 (S.D. Ill. 2014) ("[M]otions and memoranda are not pleadings." (citation omitted)). In other words, the Court may (1) "convert the 12(b)(6) motion into a motion for summary judgment under Rule 56 and proceed in accordance with the latter rule," or (2) "exclude the documents . . . and continue under Rule 12." *Levenstein v. Salafsky*, 164 F.3d 345, 347 (7th Cir. 1998). The Court has discretion in determining which option to choose. *Id.*

Here, Plaintiff moves the Court to supplement its opposition brief—not its complaint—with an exhibit containing an affidavit and documents evidencing an ongoing investigation that is occurring in Texas.[2] As presented, this exhibit constitutes extrinsic evidence, and I am not

---

[2] Plaintiff's motion does not seek to supplement a pleading but supplement a brief with additional evidence, which does not trigger Fed. R. Civ. P. 15(d)'s standard.

persuaded this extrinsic evidence should compel the Court to exercise its discretion in converting the motion to dismiss into a motion for summary judgment. "If [Plaintiff] wants to present new facts to the district court, Rule 15(c) of the Federal Rules of Civil Procedure provides the proper mechanism by which a party may supplement a pleading with transactions, occurrences, or events which have transpired since the date of the pleading sought to be supplemented." *Perry v. Vill. of Arlington Heights*, 186 F.3d 826, 830 (7th Cir. 1999) (concluding "the district court did not err by refusing to consider [the plaintiff's] supplemental affidavits addressing facts that arose after the filing of [the plaintiff's] complaint."). Additionally, the affidavit and documents attached to the motion to supplement introduce facts that are new, ongoing, and confidential, suggesting that the parties should have an opportunity to conduct discovery on those allegations. *Tradewinds Glob. Logistics, LLC v. Garrett's Transp., LLC*, No. 1:15-cv-00608-RLY-DKL, 2015 WL 8362401, at *2 (S.D. Ind. Dec. 8, 2015) (concluding that permitting the parties to engage in discovery was more appropriate than convert the motion into one for summary judgment); (*see* ECF 61 at 4 (stating "at the time of filing Opposition[,] PBE had not received a response to the subpoena issued to the Sheriff's Office of Harris County, Texas concerning Defendants' unlawful conduct in Texas, where they employed similarly deceitful tactics as they employed against PBE," and that "all relevant information concerning the Miller Defendants has not yet been released by Harris County due to confidential information in [the] Harris County Case . . . ." (citation omitted))).

Further, Plaintiff seeks to strengthen its argument regarding the enterprise allegations, the amount in controversy, and the misappropriation of goodwill and interference claims, however, as discussed below, I have identified deficiencies regarding other claims in the complaint that are not addressed and cannot be remedied by the supplemented exhibit. The deficiencies include the

allegations of pattern and racketeering activity pertaining to the RICO claim, and Plaintiff's state law claims of fraud, intentional misrepresentation, and disgorgement. Consequently, even if the Court grants the motion to supplement and converts the motion to dismiss to a motion for summary judgment, the identified deficiencies cannot survive the motion for summary judgment. Thus, supplementing the opposition brief to bolster Plaintiff's arguments would result in a futile effort, as least insofar as the claims that do not survive. Additionally, I will recommend that Plaintiff be given leave to amend its complaint with respect to the allegations against Defendants, *see infra*, and should Plaintiff be given such an opportunity, it could attach the exhibits it seeks to supplement in its motion to supplement.

Thus, I CONCLUDE that Plaintiff's motion for leave to file a supplement to its opposition brief (ECF 61) should be DENIED.

### B. Failure to State a Claim for Relief

Moving to Defendants' motion to dismiss for failure to state a claim upon which relief may be granted (ECF 45, 46), Defendants seek to dismiss Counts I through V of the complaint under Rule 12(b)(6). Defendants' arguments are evaluated in turn.

1. Count I - RICO Claim

Defendants first contend that the allegations in Count I of the complaint do not establish a RICO violation because Plaintiff failed to properly allege that (1) Defendants formed an enterprise, (2) a pattern existed, and (3) Defendants engaged in racketeering activity. Instead, Defendants argue that the RICO claim is a pretext for converting "a run of the mill business contract dispute into a federal racketeering crime to invoke the jurisdiction of this Court." (ECF 46 at 5).

8

"The RICO statute makes it 'unlawful for any person employed by or associated with any enterprise . . . [with an interstate or foreign commerce nexus] to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.'" *Ryder v. Hyles*, 27 F.4th 1253, 1256-57 (7th Cir. 2022) (alteration in original) (quoting 18 U.S.C. § 1962(c)). To successfully plead a RICO claim, a plaintiff must plead "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Menzies v. Seyfarth Shaw LLP*, 943 F.3d 328, 336 (7th Cir. 2019).

i.    *Enterprise*

Turning first to the enterprise allegations, Defendants assert that Plaintiff fails to identify the enterprise without using "nondescript" words. (ECF 46 at 6). They point to the lack of clarity as to the entities involved, and the lack of allegations about the relationship among those in the enterprise and the continuity and longevity of the enterprise. (*Id.*). In response, Plaintiff asserts that it successfully alleged that a RICO enterprise exists based on an association-in-fact enterprise theory. (ECF 49 at 7).

"A RICO enterprise is an ongoing structure of persons associated through time, joined in purpose, and organized in a manner amenable to hierarchical or consensual decision-making." *Richmond v. Nationwide Cassel L.P.*, 52 F.3d 640, 644 (7th Cir. 1995) (citation and internal quotation marks omitted). Under the association-in fact theory, an enterprise is defined as a "union or group of individuals associated in fact although not a legal entity." *Id.* (citation omitted). The key inquiry in determining if an association-in-fact enterprise exists is whether the defendants "share structural features like a common purpose, relationship, and longevity to permit them to pursue the enterprise's purpose." *Sheikh v. Wheeler*, 790 F. App'x 793, 796 (7th Cir. 2019) (citing *Boyle v. United States*, 556 U.S. 938, 946 (2009) and *Bible v. United Student*

*Aid Funds, Inc.*, 799 F.3d 633, 655-56 (7th Cir. 2015)). This showing may be made "by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *Richmond*, 52 F.3d at 644 (citation omitted). However, the enterprise "must have some continuity and some differentiation of the roles within it", and there must be "a structure and goals separate from the predicate acts themselves." *Id.* at 645 (citations omitted).

Plaintiff's complaint alleges the enterprise's common purpose and longevity, but it fails to plead the necessary relationship between Defendants. As to common purpose, the relevant allegations of the complaint read as follow:

> 40. The RICO enterprise operates through PEM. The RICO enterprise has an organizational structure and policies designed to accomplish the following goals:
>
> > a) The first goal of the racketeering enterprise is to operate a facially legal entity, PEM, to conduct a business scheme to defraud and extort from individuals such as Plaintiff.
> >
> > b) The second goal of the racketeering enterprise is to attract clients by misrepresenting the terms upon which PEM will provide services.
> >
> > c) The third goal of the racketeering enterprise is to enter into sub contracts upon false grounds.
> >
> > d) The fourth goal of the racketeering enterprise is to use the funds obtained through subcontracts to enrich PEM, Pyramid and Miller, and to circumvent federal law against fraudulent inducement and extortion.

(ECF 2 ¶¶ 40; *see* ECF 49 at 12-13). Those allegations properly allege the enterprise's common purpose, satisfying this requirement of the association-in-fact enterprise theory. *See Sheikh*, 790 F. App'x at 796.

As to longevity, Plaintiff alleges in its complaint that the predicate acts "began in July 2019 and continue until the present with PBE's continuing payments directly for labor, materials and expenses that are PEM's obligation," meaning until June 2021, the date Plaintiff filed the

complaint. (ECF 2 ¶ 46). Most of the alleged "multiple, repeated and continuous illegal acts involving mail and wire fraud and extortion," occurred from July 15, 2019, to August 28, 2019. (*Id.* ¶ 45). The alleged timeline is sufficient for Defendants to accomplish the four purposes described in the complaint.[3] Two months, though short, is sufficient for Defendants to attract a general contractor such as Plaintiff, to enter into subcontracts, and to receive funds obtained by fraud and false grounds.[4]

Thus, the complaint alleges that "the enterprise had 'affairs' of sufficient duration to permit [each] associate to 'participate' in those affairs . . . ." *Boyle*, 556 U.S. at 946; *Browning v. Flexsteel Indus., Inc.*, 955 F. Supp. 2d 900, 912 (N.D. Ind. 2013) ("'[L]ongevity' merely means that the 'relationships' persist long enough to accomplish the 'purpose' of the enterprise."). As such, the allegations in the complaint also satisfy the "longevity" requirement of the association-in-fact enterprise theory.

While the complaint properly alleges longevity and common purpose, it fails to plead the relationship among the Defendants in the enterprise. The complaint alleges that "Pyramid Consulting & Construction, LLC . . . is a dba for PEM" (ECF 2 ¶ 6), and that "Phillip E. Miller . . . is the Chief Executive Officer and Managing Member of PEM" (*id.* ¶ 7). The complaint generally describes "an ongoing organization, formal or informal," and "that the various

---

[3] Though Defendants state that "[t]here are no allegations of continuity or longevity sufficient to permit those associates to pursue the enterprise's purpose as required in *Boyle*," they do not meaningfully explain how the longevity requirement is not fulfilled in this case.

[4] While I find the longevity requirement satisfied for the purpose of establishing the existence of an enterprise, the allegations are not of a sufficient duration to satisfy the pattern element of the RICO claim. In effect, both elements have different standards. *Menzies v. Seyfarth Shaw LLP*, 197 F. Supp. 3d 1076, 1093 (N.D. Ill. 2016) ("As with all RICO enterprises, . . . the existence of an association-in-fact 'enterprise' is a 'separate' element from the 'pattern' of racketeering activity itself." (citing *United States v. Turkette*, 452 U.S. 576, 583 (1981))). Put simply, "RICO requires separate or distinct elements, even though the proof at trial may coalesce." *Id.* (citation and internal quotation marks omitted). Thus, the duration of predicate acts may be sufficient to satisfy the longevity requirement of an enterprise, but not to establish a pattern. *See id.* at 1100 (finding duration of several months sufficient to satisfy enterprise element, but not sufficient as to pattern element because of a lack of continuity).

associates function as a continuing unit." *Richmond*, 52 F.3d at 644. However, it does not allege what role each Defendant plays in the enterprise, how those three entities operate within the enterprise, nor does it allege "a structure and goals separate from the predicate acts themselves." *Id.* at 644-45. I am unable to ascertain "differentiation of the roles within" the enterprise. *Id.* at 645. Thus, the complaint does not sufficiently plead that an enterprise exists under an association-in-fact theory. On this basis alone, Plaintiff's RICO claim must fail because the allegations cannot support the conclusion that Defendants had the necessary relationship to be an enterprise.

     *ii.    Pattern*

     Next, Defendants argue that Plaintiff has not made the allegations necessary to establish a pattern of racketeering activity because the complaint at most demonstrates one breach of contract. (ECF 46 at 7). Defendants argue that the facts related to the deal "don't demonstrate a 'pattern' of anything, they don't establish any risk to the public, and they don't equate, or come anywhere close to equating, to racketeering under RICO." (*Id*. at 7-8 (citation omitted)).

     A pattern of racketeering activity requires "'at least two acts of racketeering activity' within a ten-year period." *Menzies*, 943 F.3d at 336 (quoting 18 U.S.C. § 1961(5)). In addition, a civil RICO claim "must also satisfy the so-called 'continuity plus relationship' test: the predicate acts must be related to one another (the relationship prong) *and* pose a threat of continued criminal activity (the continuity prong)." *Midwest Grinding Co. v. Spitz*, 976 F.2d 1016, 1022 (7th Cir. 1992) (alteration in original) (citations omitted); *Menzies*, 943 F.3d at 337 ("To plead a pattern of racketeering activity, a plaintiff must demonstrate a relationship between the predicate acts as well as a threat of continuing activity—a standard known as the 'continuity plus relationship' test." (citation and internal quotation marks omitted)). "Satisfying the pattern

element is no easy feat and its precise requirements have bedeviled courts." *Menzies*, 943 F.3d at 336 (citations omitted).

"Demonstrating the relatedness of the predicate acts is often non-controversial." *3BTech Inc. v. Garelick*, No. 3:21-CV-34 JD, 2021 WL 5206100, at *8 (N.D. Ind. Nov. 9, 2021) (citing *Vicom, Inc. v. Harbridge Merch. Servs., Inc.*, 20 F. 3d 771 (7th Cir. 1994)). The relationship prong is satisfied if the acts "'have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.'" *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 240 (1989) (quoting 18 U.S.C. § 3575(e)). In other words, courts evaluate whether predicate acts are "close in time and character, undertaken for similar purposes, or involving the same or similar victims, participants, or means of commission." *Menzies*, 943 F.3d at 337 (citation omitted).

The relationship prong is not what defeats Plaintiff's pattern allegations. Here, the complaint alleges that Miller, Pyramid, and PEM were the participants, they shared a common purpose of defrauding general contractors like Plaintiff, and their means of commission was to induce Plaintiff via wire and mail to enter into a contract that Defendants could and would not fulfill, by representing that they were subcontractors capable of fulfilling contractor agreements. Additionally, many of the alleged acts occurred within two months of each other. Therefore, the complaint shows that the alleged predicate acts are close in time and in character, as they have the same or similar purposes, results, participants, victims, or methods of commission. *See H.J. Inc.*, 492 U.S. at 240; *Menzies*, 943 F.3d at 337.

However, much like predecessor cases involving RICO claims, the complaint's Achille's heel resides in the continuity allegations. "Whether there is continuity depends on the facts of each case." *Hartz v. Friedman*, 919 F.2d 469, 472 (7th Cir. 1990) (citation omitted). In the year

following the Supreme Court's seminal decision in *H.J., Inc. v. Northwestern Bell*, the Seventh

Circuit decided several cases and had in each case concluded that the necessary continuity was

absent. *Id.* (collecting cases). The Seventh Circuit now evaluates the continuity prong with

reference to the four "*Morgan* factors": (1) the number and variety of predicate acts and the

length of time over which they were committed; (2) the number of victims; (3) the presence of

separate schemes; and (4) the occurrence of distinct injuries. *U.S. Textiles, Inc. v. Anheuser-*

*Busch Cos.*, 911 F.2d 1261, 1266-67 (7th Cir. 1990) (citing *Morgan v. Bank of Waukegan,* 804

F.2d 970, 975 (7th Cir. 1986)); *Vicom, Inc.*, 20 F.3d at 780.

    Three of the four factors undercut Plaintiff's continuity allegations. First, the number and

variety of predicate acts and the length of time over which they were committed mitigate against

finding that a pattern exists. Courts have emphasized that the repetition of predicate acts, when

based on mail and wire fraud, does not weigh in favor of finding a pattern. *See Hartz*, 919 F.2d at

473 ("Mail fraud and wire fraud are perhaps unique among the various sorts of 'racketeering

activity' possible under RICO in that the existence of a multiplicity of predicate acts (here, the

mailings) may be no indication of the requisite continuity of the underlying fraudulent activity."

(citing *Lipin Enters. Inc. v. Lee,* 803 F.2d 322, 325 (7th Cir. 1986) (Cudahy, J., concurring)));

*Menzies,* 943 F.3d at 338 ("Given the[] heightened pleading standard[] and Congress's insistence

that a RICO claim entail a clear pattern of racketeering activity, we have cautioned that 'we do

not look favorably on many instances of mail and wire fraud to form a pattern.'" (citing *Midwest*

*Grinding*, 976 F.2d at 1024-25)); *see also Jennings v. Auto Meter Prods., Inc.*, 495 F.3d 466, 475

(7th Cir. 2007) (explaining that the Seventh Circuit has "repeatedly rejected RICO claims that

rely so heavily on mail and wire fraud allegations to establish a pattern" (citations omitted)).

Additionally, while Plaintiff claims that the predicate acts have continued until "present," the alleged acts in the complaint seemed to have occurred only between July and August 2019. (*Compare* ECF 2 ¶ 45, *with id.* ¶ 46). The predicate acts lasted two months, and two months is an insufficient duration to establish a pattern. *Olive Can Co. v. Martin*, 906 F.2d 1147, 1151 (7th Cir. 1990) (calling six months in the same context a "short period of time"); *Uni\*Quality, Inc. v. Infotronx, Inc.,* 974 F.2d 918, 922 (7th Cir.1992) ("[O]ne scheme that lasted at most seven to eight months" was "precisely the type of short-term, closed-ended fraud that, subsequent to [*H.J., Inc.*], this circuit consistently has held does not constitute a pattern."); *Midwest Grinding*, 976 F.2d at 1024 (collecting cases); *Vicom, Inc.*, 20 F.3d at 780 (observing that "a time frame of less than nine months likely does not satisfy the duration requirement"). While Plaintiff alleges that the acts are "continuous in that they . . . continue until the present," the relevant duration relates to the underlying predicate acts, which all occurred between July and August 2019. (ECF 2 ¶ 45); *see 3BTech Inc*, 2021 WL 5206100, at \*10 ("Plaintiffs imply that the attempted extortion is ongoing because the property has not been returned and [defendant] is still trying to use it as leverage in the divorce proceeding. . . . However, when determining duration, Courts look to the date the underlying predicate act occurred on." (citing *Jennings*, 495 F.3d at 466)).

Second, while the complaint alleges that the enterprise "has a history of operating within Ohio, Indiana, Texas and throughout the United States," it does not identify other victims in those states. (ECF 2 ¶ 41). The Seventh Circuit has cautioned against "pointing to others," notably when claiming mail fraud as a predicate act of racketeering activity. *See Menzies*, 943 F.3d at 341 ("RICO's pattern element requires more than a plaintiff pointing to others and saying, on information and belief, that those persons received mailings about an allegedly fraudulent loan scheme." (citation omitted)). The allegation that the enterprise has engaged in a

pattern across several states does nothing more than "point to others," without additional specific information. Thus, the only victim identifiable in the complaint is Plaintiff, and that is likewise not sufficient to establish a pattern. *See U.S. Textiles, Inc.*, 911 F.2d at 1269-69; *Uni\*Quality, Inc.,* 974 F.2d at 922.

Third, Plaintiff's allegations of distinct predicate acts do not show the presence of separate schemes. The predicate acts and the four alleged purposes of the enterprise are all connected to the subcontracting relationship arising out of the Crown agreement, and they all support an economic injury that "stem from the same original contract." *Vicom, Inc.*, 20 F.3d at 782. The third factor does not help Plaintiff as the alleged predicate acts were all in furtherance of the same scheme. *Menzies*, 197 F. Supp. 3d at 1099-1100 (stating the plaintiff made a "weak showing" of continuity because the complaint alleges only a single scheme against a single victim).

The fourth factor is the only factor supporting a finding that Defendants' conduct was a pattern, as Plaintiff alleges distinct injuries: the loss related to the $35,000 payment, and the loss of current and future business with Crown Castle, amounting to over one million dollars. (ECF 2 ¶¶ 31, 34). However, on balance, this factor is not sufficient to show the type of continuity necessary for a RICO claim, especially as courts have repeatedly held that the first factor, the number and variety of predicate acts and the length of time over which they were committed, "is weighed the most heavily." *3BTech Inc.*, 2021 WL 5206100, at \*9 (citing *Midwest Grinding*, 976 F.2d at 1024 and *Vicom, Inc.*, 20 F.3d at 781). In general, the complaint does not show that Defendants present a "threat of continued criminal activity." *See H.J., Inc.,* 492 U.S. at 239. As such, the RICO allegations do not adequately plead a pattern.

iii.     *Racketeering Activity*

Finally, Defendants argue that Plaintiff has not alleged a racketeering activity with enough particularity with respect to its mail and wire fraud claims, and that Plaintiff's extortion allegations under the Hobbs Act cannot serve as predicate acts of racketeering activity. (ECF 46 at 8). Instead, Defendants argue that the allegations only show failed attempt to contract, failure to fulfill future obligations, and at most unjust enrichment—not fraud nor misrepresentation. (*Id.* at 10).

Mail and Wire Fraud

When a plaintiff "seeks to plead RICO's pattern element through predicate acts of mail or wire fraud . . . the heightened pleading requirements of Fed. R. Civ. P. 9(b) apply and require a plaintiff to do more than allege fraud generally." *Menzies*, 943 F.3d at 338 (citation omitted). Under Rule 9(b), a plaintiff must provide "precision and some measure of substantiation" to each fraud allegation, meaning a plaintiff must plead the "who, what, when, where, and how" of the alleged fraud. *Id.* (citations omitted). In other words, in order to satisfy this standard, a plaintiff must allege "the identity of the person who made the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation" perpetrating the fraud was communicated to the plaintiff. *Vicom*, 20 F.3d at 777 (citations and quotation marks omitted).

Plaintiff's complaint alleges the following predicate acts of mail and wire fraud:

a)   PEM and Miller placed telephone calls to PBE on July 15, 2019, August 6, 2019, August 8, 2019, August 18, 2019, August 28, 2019[,] and others to fraudulently induce it to remit funds.

b)   PEM, Pyramid and Miller used PEM to attempt to manipulate PBE into paying 90% of funds received from Crown Castle.

c)   PEM, Pyramid and Miller also used PEM as a conduit to divert funds to

17

PEM and Miller.

d)   PEM, Pyramid and Miller obtained funds from PBE on July 15, 2019, August 6, 2019, August 8, 2019, August 18,[] 2019[,] and others without providing labor, materials or supervision, and absconded with equipment.

e)   On July 15, 2019, August 6, 2019, August 8, 2019[,] and others PEM, Pyramid and Miller fraudulently told PBE via wire email that if PBE signed a subcontractor agreement that PEM would provide labor, materials and supervision on Crown project sites.

f)   On July 15, 2019[,] PEM, Pyramid and Miller also fraudulently told PBE that if it engaged PEM as subcontractor or lower tier contractor for the Crown project, that PEM, Pyramid, Miller, Atlantic and Chesapeake would execute a contract meeting the subcontractor requirements of the Crown Agreement, and PEM would supply the manpower, resources and funds to fulfill the subcontractor claims under the Agreement.

g)   On July 12, 2019, as part of PEM's scheme, PEM utilized the wires and internet to transmit a fraudulently proposed subcontractor agreement, Exhibit B, to [P]BE.

h)   In order to maintain progress of construction that PBE had already commenced at certain Crown Castle Construction sites, PBE was forced into an interim oral agreement with PEM that was structured to meet Crown Castle's requirements until PEM executed the required appropriate agreement with PBE. See Exhibit C.

i)   PBE made several partial payments to PEM on or about July 15, 2019, August 8, 2019 and August 18, 2019 totaling $35,000.00 which sums were extorted from PBE in violation of the Hobbs Act.

j)   On August 27, 2019[,] PEM, Pyramid and Miller submitted the agreement at Exhibit D to PBE via email again doing so in an illegal and fraudulent attempt to carry out PEM'[s] scheme.

k)   On July 15, 2019, August 8, 2019, August 18, 2019[,] and others PBE paid directly for labor, materials and expenses that are PEM's obligation.

(ECF 2 ¶ 45; *see* ECF 49 at 20-21 (citing ECF 2 ¶ 45)).[5]

---

[5] Plaintiff may have intended to attach exhibits to bolster or add allegations of predicate acts (ECF 2 ¶¶ 19, 28-30, 32, 45 (referencing Exhibits A, B, C, and D)), but they do not appear on the docket. As such, those exhibits cannot help the Court determine whether the allegations of predicate acts fulfill the heightened pleading requirement.

While Plaintiff arguably pleads more than two predicate acts, those acts are not specific enough to give the requisite notice to Defendants under Rule 9(b). Predicate acts (b), (c), and (h), do not allege "when" the alleged fraudulent acts occurred. Predicate act (c) does not allege "how" Defendants used the PEM entity as a conduit to divert funds. Predicate acts (a), (e), (f), (g), (j), and (i) do not allege the "what," meaning the content of the alleged communication making them "fraudulent" or rendering them acts of extortion.[6] And predicate act (k) is not so much a predicate act as it is the result of one. Thus, Plaintiff fails to provide "precision and some measure of substantiation" to its wire and mail fraud claims, rendering these allegations unable to satisfy the heightened pleading standard of fraud.[7]

Extortion under the Hobbs Act

"Extortion is a federal crime . . . only when property is obtained by consent 'induced by wrongful use of actual or threatened force, violence, or fear . . . .'" *Rennell v. Rowe*, 635 F.3d 1008, 1011 (7th Cir. 2011) (second alteration in original) (quoting 18 U.S.C. § 1951(b)(2)).

---

[6] Predicate act (f) alleges that Defendants fraudulently told Plaintiff they would provide labor, materials and supervision on Crown project sites and execute a contract with their insurers meeting the subcontractor requirements of the Crown agreement (ECF 2 ¶ 25; *see id.* ¶ 45). The complaint indicates that this statement may not be entirely true as "on information and belief, Plaintiff was made an additional insured and loss payee" of Defendants' insurance provided by Chesapeake and Atlantic. (*Id.* ¶ 62).

[7] There is some disagreement among courts about the specificity required for allegations of an entity's identity. Precedent suggests that a plaintiff must allege identities of an entity's officers or representatives. *Vicom, Inc.*, 20 F.3d at 777-78 ("Because fair notice is '[p]erhaps the most basic consideration' underlying Rule 9(b), Wright & Miller, [Federal Practice and Procedure] § 1298, at 648, the plaintiff who pleads fraud must 'reasonably notify the defendants of their purported role in the scheme.'" (citing *Midwest Grinding*, 976 F.2d at 1020)); *Kruse v. GS Pep Tech. Fund 2000 LP*, 897 F. Supp. 2d 769, 779 (N.D. Ind. 2012) ("Plaintiffs not only fail to identify the entity responsible for making the misrepresentations, they neglect to identify the individual actors who would have conducted business on behalf of those entities so that Defendants are notified of their purported role in the fraud." (citing *Design Time, Inc. v. Synthetic Diamond Tech., Inc.*, 674 F. Supp. 1564, 1569 (N.D. Ind. 1987))). On this basis, all predicate acts would fail, as the allegations involving PEM and Pyramid do not indicate which officer or representative, meaning "who," was involved in the acts. However, other courts have held that a plaintiff need not allege the name of an entity's employee. *See Munster Steel Co. v. Crane 1 Servs., Inc.*, No. 2:16-CV-345, 2018 WL 620382, at *3 (N.D. Ind. Jan. 30, 2018) (footnote omitted) ("While the specific identity of the Crane 1 employee or employees responsible for the fraud is not mentioned in the complaint, there is some precedent for the notion that the 'institutional identity' will suffice at the motion to dismiss stage." (citations omitted)). Regardless of the identity allegations, because the allegations collectively fail to reflect the "when," "how," and "what," Plaintiff's mail and wire fraud allegations fail to meet the requirements of Rule 9(b).

Plaintiff seems to advance a fear-induced theory of extortion under the Hobbs Act, which can occur

> when a person uses physical violence or the threat of violence to obtain property, whether or not the defendant has a claim to the property. If a defendant has no claim of right to property, the use of fear to obtain that property—including the fear of economic loss—may also amount to extortion. In contrast, where the defendant has a claim of right to property and exerts economic pressure to obtain that property, that conduct is not extortion and no violation of the Hobbs Act has occurred.

*Id.* at 1012; (*see* ECF 2 ¶ 15 ("Defendants . . . used or attempted to use PBE's reasonable fear of economic harm in order to induce PBE to give up its money to them."); ¶ 18 ("PEM, in collusion with Defendants Pyramid and Miller, induced fear in PBE by interfering with and disrupting PBE's construction project, thereby extorting and obtaining money from PBE which PEM did not earn.")). Under the fear-induced theory, "the victim's fear must be reasonable." *Roger Whitmore's Auto. Servs., Inc. v. Lake Cnty., Ill.*, 424 F.3d 659, 671 (7th Cir. 2005) (citation omitted).

The allegations in the complaint do not rise to the level of extortion. Plaintiff merely alleges that the parties could not reach an agreement, that Plaintiff took a risk—in reliance on Defendants' assurance that they will come to an agreement and provide resources—by entering into an oral agreement with Defendants to maintain progress on the Crown projects it had commenced, despite not having the benefit of a written agreement and seemingly remaining in the negotiation phase of the contract. Even if Plaintiff feared economic loss as a result of the lack of progress on the Crown project sites, Plaintiff's allegations that it was "forced into an interim oral agreement" are not supported by the allegations in the complaint. (ECF 2 ¶ 45). There are no allegations pertaining to the circumstances of the payments allegedly extorted, and thus no basis to conclude that Defendants wrongfully used actual or threatened force, violence, or fear, or that they requested the payments in the first place. Defendants "may . . . have breached [their] duties

20

under the contract[] and acted in violation of the general duty of good faith and fair dealing, among other things. But those claims should be pursued through state-law theories of contract and, perhaps, tort—not civil RICO." *Rennell*, 635 F.3d at 1014. Therefore, the complaint's extortion allegations also fail to serve as predicate acts for Plaintiff's RICO claim.

In conclusion, Plaintiff has failed to plead that the mail and wire fraud allegations and the allegations of extortion under the Hobbs Act, can serve as predicate acts of racketeering activity. Thus, in addition to the fact that Plaintiff has not adequately plead the pattern and enterprise elements of a RICO claim, Plaintiff has also failed to sufficiently plead the racketeering activity element. Therefore, I FIND that the RICO claim in Count I should be dismissed.

2. Counts II & III - Intentional Misrepresentation and Fraud Claims

Next, Defendants argue that Plaintiff's intentional misrepresentation and fraud claims under Indiana law in Counts II and III do not meet the heightened pleading standard under Rule 9(b) and that, even if the standard is met, the fraud claim cannot survive as Plaintiff's fraud allegations are more akin to a breach of contract claim. (ECF 46 at 12-14); *see Buffet Crampon S.A.S v. Schreiber & Keilwerth, Musikinstrumente Gmbh*, No. 3:09-CV-347RM, 2009 WL 3675807, at *17 (N.D. Ind. Nov. 2, 2009) ("[T]o the extent [the plaintiff] asserts claims sounding in fraud—*i.e.*, 'passing off', intentional misrepresentation, etc.—the heightened requirement is triggered . . . .").

The two claims are predicated on the same facts alleged to support Plaintiff's RICO claim. (*See* ECF 2 ¶¶ 48-50, 52-54). I concluded that those allegations are not made with sufficient particularity with respect to the RICO claim, thus, this conclusion applies with respect to the state law fraud and misrepresentation claims as well. Because the allegations do not meet

the heightened pleading requirement under Rule 9(b), I FIND that the intentional misrepresentation and fraud claims in Counts II and III must also fail.[8]

### 3. Count IV - Disgorgement Claim

Defendants also take issue with Plaintiff's disgorgement claim in Count IV, by arguing it is an equitable remedy, not a claim that can be asserted against a party. (ECF 46 at 14). They further argue that, while Plaintiff seeks to assert the disgorgement claim pursuant to a fiduciary duty, the complaint fails to allege that Defendants owed a fiduciary duty. (*Id.*).

"[D]isgorgement is not a punishment but rather an equitable form of relief." *State ex rel. Ind. State Bar Ass'n v. United Fin. Sys. Corp.*, 926 N.E.2d 8, 18 (Ind. 2010) (citations and internal quotation marks omitted). Disgorgement is an appropriate remedy for a breach of fiduciary duty. *West v. J. Greg Allen Builder, Inc.*, 92 N.E.3d 634, 645 (Ind. Ct. App. 2017); *see also Wenzel v. Hopper & Galliher, P.C.*, 830 N.E.2d 996, 1001 (Ind. Ct. App. 2005). Plaintiff's complaint alleges that "[t]o the extent Defendants breached fiduciary duties owed to PBE, PBE is entitled to disgorgement of any amounts realized by Defendants by reason of their breach." (ECF 2 ¶ 57). Neither the complaint nor Plaintiff's brief allege or seek to demonstrate that Defendants owed Plaintiff a fiduciary duty. If there are any grounds in the complaint to support the barebones statement that Defendants breached fiduciary duties owed to Plaintiff, "the Court 'cannot fill the void by crafting arguments and performing the necessary legal research.'" *Mojsoski v. Indiana Wesleyan Univ.*, No. 1:22-CV-00019-SLC, 2022 WL 17338426, at *12 (N.D. Ind. Nov. 30, 2022) (citing *Knox v. Byrne*, 821 F. App'x 643, 644 (7th Cir. 2020)). Thus,

---

[8] In light of my conclusion that the allegations do not meet the heightened pleading requirement, I need not reach Defendants' argument that Plaintiff's fraud claim is akin to a breach of contract claim.

Count IV does not apprise Defendants of the basis for such request for relief, and I FIND
dismissal of the disgorgement claim in Count IV appropriate here.

###### 4. Count V - Misappropriation of Name and Goodwill Claim

Defendants aim the last arrow of their quiver at Plaintiff's misappropriation claim in
Count V. They assert that Plaintiff does not have an appropriation claim—which I understand to
refer to Plaintiff's misappropriation claim—under Indiana law as it is a property right that
corporations do not possess. (ECF 46 at 15). Defendants further argue that Plaintiff does not
properly plead other legal notions under which the misappropriation claim may survive. (*Id.* at
15-16). In opposition, Plaintiff claims that the misappropriation claim sounds in unfair
competition law, and that Indiana law recognizes misappropriation of a corporation name or
likeness under the law of unfair competition and tortious interference with business relations.
(ECF 49 at 20-21).

Defendants are right in that, under Indiana law, corporations do not have a right to
privacy, and thus, corporations have no claim for invasion of privacy. *Felsher v. Univ. of
Evansville*, 755 N.E.2d 589, 592-95 (Ind. 2001). However, as Plaintiff points out, the Indiana
Supreme Court has recognized that "an appropriate remedy for the misappropriation of a
corporation name or likeness is found under the state unfair competition law and trademark
statutes, as well as common law torts unrelated to notions of privacy, such as tortious
interference with business relations." *Id.* at 598. The parameters of an unfair competition claim
are murky:

> [u]nfair competition . . . does not describe a single course of conduct or a tort with a
> specific number of elements; it instead describes a general category into which a number
> of new torts may be placed when recognized by the courts. The category is open-ended,
> and nameless forms of unfair competition may be recognized at any time for the
> protection of commercial values.

*Id.* Tortious interference with business relationships is defined (more clearly) as "(1) the existence of a valid relationship; (2) the defendant's knowledge of the existence of the relationship; (3) the defendant's intentional interference with that relationship; (4) the absence of justification; and (5) damages resulting from defendant's wrongful interference with the relationship." *Id.* at 598 n.21 (citation omitted).

To begin with, I am not fully persuaded that the *Felsher* court fully "recognized" misappropriation of name and likeness as an independent cause of action, such that it may be placed in the "general category" of unfair competition law, as Plaintiff contends. *See id.* at 598. Rather, I read the *Felsher* decision as suggesting that, when a corporation seeks a remedy for the misappropriation of its name or likeness, the appropriate cause of action lies either in unfair competition law, trademark statutes or a common law tort such as tortious interference with business relations. *Id.* ("[A]n appropriate remedy for the misappropriation of a corporation name or likeness is found under the state unfair competition law and trademark statutes, as well as common law torts unrelated to notions of privacy, such as tortious interference with business relations.").[9] No such claim has been made in the complaint: it contains no facts suggesting that Defendants attempted to pass off as Plaintiff's business or that Defendants infringed upon Plaintiff's trademark. And while the complaint mentions in a barebones fashion that Defendants "interfered" with Plaintiff's contract with Crown Castle, Plaintiff is not suing for tortious interference.[10]

---

[9] In the absence of unambiguous language recognizing misappropriation as a cause of action, I am unwilling to take the step of recognizing that tort under Indiana law.

[10] Plaintiff's motion for leave to file a supplement to its opposition brief (ECF 61) also suggests that the misappropriation claim is not based on an interference of business relations theory. In effect, Plaintiff seeks to supplement its brief with evidence showing that Defendants represented to third parties that Plaintiff's employee was instead Defendant Miller's (ECF 61 at 5), an allegation placing Plaintiff's claim closer to a "passing off" theory of unfair competition.

If Plaintiff is right that its claim of misappropriation of a corporation name or likeness under a tortious interference with business relations theory is cognizable under Indiana law, the complaint still fails to appropriately allege facts supporting such claim. I agree with Defendants that "Plaintiff's singular paragraph 59 of its Complaint, containing the bald assertion that 'PEM misappropriated PBE's public name, persona, and goodwill, is wholly insufficient to adequately notify the Miller Defendants of misappropriation . . . ." (ECF 55 at 11 (citing ECF 2 ¶ 59)). Thus, however broad unfair competition may be, Plaintiff does not develop its misappropriation claim to fulfill the requirement of notice pleading. Therefore, I FIND that the misappropriation claim in Count V should be dismissed.

### C.  Subject-Matter Jurisdiction

In the event the Court dismisses Plaintiff's federal RICO claim, Defendants request that the breach of contract claim in Count VI be dismissed for lack of subject-matter jurisdiction. (ECF 46 at 16-20). In support of this argument, Defendants contend that Plaintiff has not met the amount in controversy requirement and that, on this basis, the Court should refrain from exercising supplemental jurisdiction over the breach of contract claim. (*Id.*).[11]

I begin with Defendants' argument that the Court lacks subject-matter jurisdiction because Plaintiff's jurisdictional allegations do not meet the threshold amount in controversy. Defendants contend that the lost revenue of over one million dollars from the lost Crown agreement is not alleged with sufficient specificity as it does not establish by a preponderance of the evidence that this amount is certain. (ECF 46 at 19). The proponent of jurisdiction has the burden of showing that the amount-in-controversy requirement is met. *Oshana v. Coca-Cola Co.*,

---

[11] The parties are diverse in citizenship for purposes of diversity jurisdiction. (*See* ECF 2 ¶¶ 4-8).

472 F.3d 506, 511 (7th Cir. 2006). "[T]he sum claimed by [the proponent of federal jurisdiction] controls if the claim is apparently made in good faith." *Meridian Sec. Ins. Co. v. Sadowski*, 441 F.3d 536, 541 (7th Cir. 2006) (second alteration in original) (citation and quotation marks omitted). If material factual allegations supporting jurisdiction are contested, then the proponent of jurisdiction must prove those jurisdictional facts by a preponderance of the evidence. *Id.* at 543. However, where none of a plaintiff's amount in controversy allegations are contested, "the standard of proof is irrelevant." *Id*. Additionally, "uncertainty about whether the plaintiff can prove its substantive claim, and whether damages (if the plaintiff prevails on the merits) will exceed the threshold, does not justify dismissal." *Id.* (citation omitted). However, dismissal is warranted "if it is 'legally certain' that the recovery (from plaintiff's perspective) or cost of complying with the judgment (from defendant's) will be less than the jurisdictional floor." *Id.*

Plaintiff repeatedly alleges in the complaint that the Crown agreement—which it alleges it lost as a result of Defendants' actions—was worth over a million dollars. (ECF 2 ¶¶ 12, 19, 34, 63; ECF 49 at 27 (citing ECF 2 ¶ 19, 34)). Although there are deficiencies with Plaintiff's complaint, the jurisdictional allegations do not appear to be made in bad faith. Additionally, Defendants do not contest the allegations that the loss of the Crown agreement cost Plaintiff over a million dollars, thus Plaintiff need not prove with a preponderance of the evidence that this allegation is true. *See Meridian Sec. Ins.*, 441 F.3d at 543.[12]

However, Defendants argue that the alleged one million dollars constitute "unspecified future lost contracts"—which I read as meaning lost profits—with Crown Castle. (ECF 46 at 19 n.5). Therefore, Defendants argue, the amount claimed cannot be included in the amount in

_____

[12] Instead, Defendants argue that the allegations pertaining to the amount in controversy are uncertain, which as stated does not warrant dismissal and is not the standard for which courts require a proponent of jurisdiction to establish allegations by a preponderance of the evidence. *See Meridian Sec. Ins. Co.*, 441 F.3d at 543.

controversy because future damages are not recoverable under breach of contract claims and because the allegations of damages for future revenue were not reasonably foreseeable. (*Id*. (citing *Belle City Amusements, Inc. v. Doorway Promotions, Inc.*, 936 N.E.2d 243, 249 (Ind. Ct. App. 2010))). I am not persuaded. Plaintiff argues that it was "offered over one million dollars of construction and engineering work for Crown Castle" and that work under the Crown agreement commenced. (ECF 49 at 9 (citing ECF 2 ¶ 19)). Plaintiff further argues that "Crown Castle terminated [the Crown] agreement with PBE on existing and *future* projects." (ECF 49 at 22 (emphasis added)). It is not entirely clear which portion of the alleged loss in revenue is attributable to the existing projects as opposed to future projects. However, that a contract encompasses future performance does not make the loss of future profit unforeseeable if the future losses "flowed directly and naturally from the . . . breach of contract" claim. *Apex Compounding Pharmacy LLC. v. Best Transp. Servs., Inc.*, No. 2:16-CV-73-TLS, 2021 WL 1037858, at *11 (N.D. Ind. Mar. 18, 2021) (citing *Sammons Commc'ns of Ind., Inc. v. Larco Cable Constr.*, 691 N.E.2d 496, 498 (Ind. Ct. App. 1998)). Here, the complaint's allegations infer that the loss of future profits under the Crown agreement flowed from the breach of oral contract between Plaintiff and Defendants, which, in turn, was tailored to conform with the contract between Plaintiff and Crown Castle. Thus, Plaintiff's alleged damages appear reasonably foreseeable.[13]

Beyond the Crown agreement, Plaintiff alleges having made payments of $35,000 to Defendants and requests punitive damages, together totaling $225,000. (ECF 2 ¶¶ 31, 45; *id.* at

---

[13] I note that there are inconsistencies in Plaintiff's complaint. At times, Plaintiff alleges that it had "a multimillion dollar contract" with Crown Castle (ECF 2 ¶ 12; ECF 49 at 20, 27-28), and other times that the contract was worth "over one million dollars" (ECF 2 ¶¶ 19, 34, 63; ECF 49 at 9, 20, 27). Should Plaintiff be given leave to file an amended complaint, Plaintiff would have an opportunity to clear up this inconsistency. However, and again, this uncertainty alone does not warrant dismissal. *See Meridian Sec. Ins.*, 441 F.3d at 543.

18). Defendants argue that punitive damages cannot be counted into the amount in controversy, thus leaving Plaintiff with only $35,000 of alleged damages, an amount well below the required $75,000 threshold. I agree. "[P]unitive damages may sometimes be taken into account in deciding whether the proper amount is in controversy." *Mayberry v. Gilbert*, No. 1:21-cv-03031-TWP-TAB, 2023 WL 34686, at *8 (S.D. Ind. Jan. 3, 2023) (quoting *Del Vecchio v. Conseco, Inc.*, 230 F.3d 974, 978 (7th Cir. 2000)). In a diversity case, courts determine whether punitive damages can satisfy the jurisdictional amount by evaluating whether they "are recoverable as a matter of state law," and if so, whether "it is clear beyond a legal certainty that the plaintiff would under no circumstances be entitled to recover the jurisdictional amount." *Cadek v. Great Lakes Dragaway, Inc.*, 58 F.3d 1209, 1211-12 (7th Cir. 1995) (citation and internal quotation marks omitted).

Applying the two-step inquiry in this case, I find that punitive damages may not be included in the amount in controversy as to the $35,000 payment. To recover punitive damages under Indiana law, "a claimant who brings both a breach of contract and a fraud claim must prove that (1) the breaching party committed the separate and independent tort of fraud; and (2) the fraud resulted in injury distinct from that resulting from the breach." *Tobin v. Ruman*, 819 N.E.2d 78, 86 (Ind. Ct. App. 2004) (citations omitted). Because Plaintiff has not successfully made a claim for fraud, as discussed *supra*, it cannot recover punitive damages on its breach of contract claim, making clear beyond a legal certainty that Plaintiff cannot recover punitive damages on the $35,000 payment. As such, only $35,000 may be counted in the amount in controversy. However, even if punitive damages related to the $35,000 payment cannot be included in the amount in controversy calculations, Plaintiff sufficiently plead an amount in controversy in excess of $75,000 based on the loss of the Crown agreement, which is worth over

a million dollars. In conclusion, because the parties do not dispute that diversity between the parties exist, and because Plaintiff has satisfied the amount in controversy, I FIND that subject-matter jurisdiction is met and that the Court may exercise its supplemental jurisdiction over the remaining state law claim.

## IV. CONCLUSION

For the foregoing reasons, I RECOMMEND Plaintiff's motion for leave to supplement its opposition brief (ECF 61) be DENIED. I further RECOMMEND that Defendants' motion to dismiss (ECF 45) be GRANTED as to Counts I through V of the complaint under Rule 12(b)(6) and that Plaintiff be given leave to amend its complaint and DENIED with respect to Count VI of the complaint under Rule 12(b)(1).

The Clerk is directed to send a copy of this Report and Recommendation to counsel for the parties. NOTICE IS HEREBY GIVEN that within fourteen days after being served with a copy of this recommended disposition, a party may serve and file specific, written objections to the proposed findings or recommendations. Fed. R. Civ. P. 72(b). FAILURE TO FILE OBJECTIONS WITHIN THE SPECIFIED TIME WAIVES THE RIGHT TO APPEAL THE DISTRICT COURT'S ORDER.

Entered this 3rd day of April 2023.

/s/ Susan Collins
Susan Collins
United States Magistrate Judge