## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## FORT WAYNE DIVISION

| | | |
|---|---|---|
| PETERS BROADCAST ENGINEERING, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 1:21-CV-219-HAB |
| | ) | |
| PEM CONSULTING GROUP, LLC, et al. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

### OPINION AND ORDER

This case is a primer in how not to conduct business. After a contract to construct communications towers in Indiana went south, Plaintiff, Peters Broadcast Engineering ("PBE"), sued Defendants PEM Consulting Group, LLC ("PEM"), Pyramid Consultants and Construction, LLC ("Pyramid"), Phillip E. Miller ("Miller"), and their general liability insurance carriers, Atlantic Casualty Insurance Company ("Atlantic") and Chesapeake Insurance ("Chesapeake"). As to PEM, Pyramid and Miller (collectively, the "Miller Defendants"), PBE asserts state law claims for breach of contract, actual fraud, fraud in the inducement, unjust enrichment, fraudulent misrepresentation, negligent misrepresentation and tortious interference with business relations. It also seeks to pierce the corporate veil and hold Miller personally liable for the torts alleged. With respect to Atlantic and Chesapeake (together, the "Insurers"), Plaintiff asserts a third-party claim for breach of contract and requests declaratory relief.[1] Presently before the Court is the Miller Defendants' motion for summary judgment on the state law claims. (ECF No. 128). The motion is fully briefed (ECF Nos.

---

[1] The Insurers have separately moved to dismiss the Amended Complaint against them. (ECF Nos. 125, 127).

128, 140, 141, 151, and 152) and ripe for consideration. For the following reasons, the Miller Defendants' Motion will be GRANTED.

## DISCUSSION

### A. Factual Background[2]

PBE is a small telecommunications engineering company located in Fort Wayne, Indiana. PBE's sole shareholder, CEO, and Founder is Robert M. Peters ("Peters"). PEM is a New Jersey limited liability company. Pyramid is an LLC that operates on PEM's behalf. Miller is the CEO and managing member of PEM and Pyramid. (Am. Compl., ECF No. 95, ¶¶s 3-6).

On May 21, 2019, PBE entered into a Construction Master Services Agreement with Crown Castle USA, Inc. ("Crown") to perform certain communications tower construction services for Crown in Indiana. (ECF No. 129, ex. 1, hereafter the "Crown Agreement"). PBE had previously done work for Crown on a different project and so Crown was familiar with PBE. (ECF No. 142-6, Decl. of Joshua Donahue at ¶¶4, 5, "Donahue Decl. ¶__"). As part of the Crown Agreement, PBE received an initial offer to assist in the construction of 33 cell sites in Indiana. (Am. Compl. ¶9, the "Crown Project"). The Crown Project involved enhancement/upgrade work on cell tower sites in Indiana, as well as the opportunity for construction of numerous other tower sites as part of the 5G rollout. (Pltf SMF ¶23, ECF No. 141).

The Crown Agreement provided that Crown would issue purchase orders to PBE for the Crown Project, but it did not guarantee quantity or value of work to be performed by PBE. (Dfdt Resp.to SMF ¶23, ECF No. 152). Specifically, paragraph 2A of the Crown Agreement provides:

---

[2]Factual recitations are taken from the parties' respective Statements of Material Facts ("Pltf SMF" or "Dfdt SMF") and their responses to those filings ("Pltf Resp. to SMF or "Dfdt Resp. to SMF"). At times, where relevant, the Court cites to specific deposition testimony relied upon in the parties' respective SMFs. Where facts are both *disputed and material* the Court references them expressly herein.

> This agreement is entered into with no guaranteed quantity or value of Work to be awarded to the Contractor. Crown [] shall have no obligation to Contractor unless and until a Purchase Order or Project Appendix is issued by Crown [] to Contractor.

(Crown Agreement, ¶2A). Likewise, PBE was not the exclusive contractor for the Crown Project and Crown reserved the right to hire other contractors for the Crown Project. *See* Crown Agreement ¶ 2(C) ("[t]his Agreement is not exclusive and Crown [] may, in its sole discretion, choose to obtain from other contractors or itself perform the same or similar services as those provided by the Contractor.") (*Id.* ¶2C).

Other provisions of the Crown Agreement detailed the terms of the parties' agreement including provisions regarding standards specifications and drawings, and subcontracting. (Pltf SMF ¶ 22). Section 7 of the Crown Agreement authorized PBE to engage subcontractors, but specified requirements for the engagement of those subcontractors.

Chris Smith ("Smith"), a former employee of PBE and owner of a company called Frequency 1, was tapped by PBE as an independent contractor to assemble field crews to do the work for the Crown Agreement. Smith's crews began work on the Crown Project for PBE sometime in May 2019. (Pltf SMF ¶ 34).

Smith knew Miller and was familiar with his companies. In May 2019, Smith facilitated email communications between PBE and the Miller Defendants regarding PBE's cell construction contract with Crown. (*Id.* ¶ 32). Peters, testifying on behalf of PBE, recalled learning from Smith about the Miller Defendants:

> Q:    …And do you know if Chris Smith reached out to Phil Miller or whether it was Mr. Miller who reached out to Chris Smith?
> A:    I have no way of knowing that.
> ….
>
> Q:    …You say [Miller] had no prior experience, but what do you know about his company?

> A:     I don't know anything except what Chris Smith told me, and he told me about all these wonderful things they'd done and how much money he had that apparently he did not have…
>
> Q:     And so it was Chris Smith that told you this information about –
>
> A:     Initially to get the conversation going, yes.

(PBE Dep., ECF No. 129-3 at 25, 79-80).[3] When asked what the purpose of bringing the Miller Defendants into the mix was, Peters testified:

> A:     I did not have the resources or the cash reserves to bring in four or five crews and maintain them; nor did I want to, frankly. I was wanting to do more of my engineering work. Nor did I want to dedicate that much energy to it. They came with what I thought was an opportunity; and because of the contract that I was offered that I could stand-by, and even on a small percentage, it would be profitable.

(*Id.* at 24).

On May 5, 2019, Smith emailed Peters and Miller a "PBE-Pyramid Initial Contract" that described the roles of each party. (PBE Dep. at 28-30). In this email, PBE was referred to as the contract holder with Crown, Miller was to provide "the field crews and equipment for the construction and completion of all sites assigned," and Frequency 1 was designated as the project and construction manager. (*Id.*). Peters referred to the May 5, 2019, email from Smith to PBE and Miller as a "first draft" and an "initial proposal." (*Id.* at 29, 41).

Nevertheless, PBE asserts in its filings that the parties entered into an interim oral agreement whereby the Miller Defendants began conducting subcontracting work even without an appropriate subcontracting agreement in place. (ECF No. 140 at 14: "In May/June 2019 PBE and the Miller Defendants, via Miller, orally agreed to a temporary or interim agreement for cell tower funding and construction services by PEM pending execution of a formal subcontract by PEM in accordance

---

[3] Page references are to the deposition page rather than the ECF page.

with the Crown Agreement."). That representation, however, appears contrary to Peters' testimony of his understanding:

> Q:     Okay. So your –PBE's position was that you guys were okay with having PEM invest money into the project without a signed written agreement between your 2 companies?
>
> A:     No, we weren't okay with that. My counsel could explain that. There were numerous correspondence to try to get this in place, but I'd already invested a lot of money and time up to that point. I guess I looked at – We had no contract at that point.

(PBE Dep. at 37).

Peters testified that Smith was working as a 1099 employee on the Crown Project and that Peters never communicated to Crown that the Miller Defendants were subcontracting on the Crown Project since no agreement had been reached:

> Q.     Okay. Did you disclose to Crown Castle when work started in May of 2019 that Chris Smith was working with you as a subcontractor?
>
> A.     He was a 1099 employee at that point as I recall…
>
> Q.     And did you ever disclose to Crown Castle in May of 2019 that Pyramid or PEM Consulting Group was working as a sub on this project?
>
> A.     No. As far as – I didn't have any agreement with PEM, so I could not do that.

(PBE Dep. at 47).

> Q:     … It's your contention that PEM was not a sub of PBE on this project?
>
> A:     I'm not contending anything. What I'm saying is that I could not have a subcontractor on site – on a Crown Castle site without an approved agreement from Crown Castle. So, no, they weren't a sub.
>
> Q:     But work was –
>
> A:     I technically couldn't do that, have them on premise. They had to be with PBE for that.

(PBE Dep. at 68-69).

> Q:     So he wasn't an employee of PBE and your contention is that he was not a sub of PBE. So is it your contention that there was no contractual relationship whatsoever between PBE and PEM?
>
> A:     Without his signed agreement, I could not use him as a subcontractor, and not only did it have to be signed, but it had to be approved by Crown Castle. We made that very clear. And it just drug on and on; and he said we'll get this straightened out, but it never got straightened out.

(*Id.* at 80-81).

      Miller likewise testified that no agreement had been reached:

    A:    Well the deal was that, you know, I was going to initially fund these contracts, right, you know to get the work going, and I was going to get paid 90 percent of the invoice and Mike was going to get paid 10 percent of it. And so that was the initial conversation at least. We never got to an agreement.

(PEM Dep., ECF No. 129-5, at 61). Thus, it appears that the principal players agree that no formalized agreement was ever reached between the parties in May and June 2019.

      Regardless of whether the parties saw eye to eye on the existence of an interim agreement, it is clear in the record that work began on the Crown Project and both PBE and the Miller Defendants were involved. Along with the work being conducted, Miller, on PEM's behalf, borrowed money from, Thomas Ross ("Ross"), a member of PEM, in the amount of $149,999.99 and used that source of payment to finance Chris Smith and his crews. (Dfdt SMF ¶ 8, ECF No. 128-2 and ECF No. 130-1).[4] PEM also supplied trucks to Smith's crews.[5] Those trucks were being leased by a separate company, Knudson, L.P ("Knudson"), based in Texas.[6]

---

[4] PBE disputes that PEM borrowed this money noting that no loan agreement between PEM and Ross was signed. PBE believes Miller borrowed the money from Ross in his individual capacity. (Pltf Resp. to Dfdt SMF ¶ 8). However, bank statements from PEM show incoming wire transfers totaling $149,999.99 from Ross deposited in the PEM corporate account. Those transfers occurred on May 14, 28, and 31, 2019.

[5] PBE also claims it had to pay for trucks for the project or that the trucks supplied by PEM were inadequate to do the work that was contemplated. The Court need not delve into this issue because, as discussed below, there was no meeting of the minds on the issue of who would supply trucks, how many, or what capabilities the trucks had.

[6] PBE includes a number of allegations in its SMF that purport to show a problematic business relationship between the Miller Defendants, Knudson and Knudson's owner, Patricia Joiner ("Joiner"). PBE includes these factual recitations presumably to show that while engaged in the Crown Project, the Miller Defendants had obligations to Knudson and Joiner and that the assets used in the Crown Project were fraudulently obtained or unauthorized by Knudson to be used on the Crown Project. None of these facts are relevant or material to the allegations in the Amended Complaint.

From May through July 2019, work on the Crown Project continued and PEM paid Smith

and his crews over $36,000. (ECF No. 130). In July 2019, PEM requested funding from PBE. On

July 12, 2019, PBE sent a check to PEM in the amount of $46,365.50 but instructed PEM not to

deposit the funds until PBE received payment from Crown. (Dfdt SMF ¶ 6; Pltf SMF ¶ 51). The

payment was memorialized in an email dated July 12, 2019, from Peters. (ECF No. 129-7, Ex. 7).

Around this same time, PEM and PBE submitted competing written proposals to each other

for a signed subcontractor arrangement. On July 17, 2019, during further negotiations for a formal

subcontractor agreement, Miller met with PBE in Fort Wayne, Indiana. PBE represents little about

the substance of this meeting and much about what did not occur. According to PBE, Miller did not

disclose that: (1) the funds and equipment/trucks being used were supplied by Knudson; (2) the

Knudson trucks were unauthorized for use on non-Knudson contracts; (3) Miller was under criminal

investigation in Texas for alleged misfeasance in its dealings with Knudson; and (4) Miller needed

immediate cash to repay Knudson. (Pltf SMF ¶¶s 42-47).

The Miller Defendants dispute some of these facts about the meeting but mostly claim that

they are immaterial to the claims asserted. They clarify, for instance, that the funds being used to

pay Smith belonged to PEM (borrowed from Ross), not Knudson, and that Miller was unaware in

July 2019 that he was under criminal investigation as he was not contacted by investigators until

the fall of 2019. (Dfdt's Resp. to Pltf SMF ¶¶s 42-47). Specifically, the Miller Defendants point to

Miller's deposition wherein he was specifically asked about the source of funding to pay Smith's

crews:

> Q:   You were a conduit. But to the extent that you needed to pay crews, when you come
>      in in June 2019, was PEM paying for those crews or was Knudson?
> A:   No, it was the money I borrowed, so it was PEM. It was all of that money
>      that got that project going. Knudson was not paying for the work in – those
>      crews in Indiana. It was PEM.

(PEM Dep., ECF No. 129-5 at 47). As for the remaining alleged non-disclosures, the Miller Defendants argue that the source of the trucks being supplied was immaterial information they were under no obligation to disclose and there was no injury to PBE since the trucks remained on-site until PBE's contract with Crown ceased.

Following this meeting, PBE sent another proposed subcontractor agreement to the Miller Defendants. (Pltf SMF ¶ 53). As of August 1, 2019, the Miller Defendants had not signed the new subcontractor proposal from PBE. (*Id.* at ¶¶s 53-54). PBE advised Miller that his delay in entering into an acceptable subcontractor agreement was jeopardizing work at the sites and PBE's relationship with Crown. (Pltf SMF ¶ 58). Throughout this time, PBE maintained full control over the funds issued to it from Crown (Pltf SMF ¶ 55).

At some point the Miller Defendants became frustrated believing that PBE had received funds from Crown for completed purchase orders and it was not remitting funds to PEM. So on August 24, 2019, Miller contacted Crown and had a conversation with Crown about not receiving payments. (Dfdt SMF, ¶ 19). The Miller Defendants also say they inquired from Crown whether they could place a lien with Crown on the Crown Project for payment. They claim that Crown advised against placing a lien especially if the Miller Defendants desired a business relationship with Crown in the future.[7] Although Peters acknowledges that he was not privy to any conversation between Miller and Crown, (PBE Dep. at 63-64: "I wasn't privy to the actual conversations with Crown."), PBE states that the Miller Defendants represented themselves as subcontractors of PBE to Crown even though they knew no formal written subcontracting agreement had been signed.

---

[7] PEM seemingly acknowledges and does not dispute that it did desire future work with Crown. However, Joshua Donahue ("Donahue"), the Site Operations Manager for Crown, does not recall any conversation from Miller about becoming a direct contractor, despite it being common in the industry. (Donahue Decl. ¶¶9-10).

After the contact with Crown, PEM withdrew financing from Smith's crews to cut its losses. PEM deposited the check it had received from PBE in July into PEM's bank account on September 5, 2019. Five days later the funds were charged back by PBE. (Dfdt SMF ¶ 7). At the time PEM left the Crown Project, the trucks that were supplied by Knudson, L.P. were still being used by Smith and his crews. (Peters Dep. at 77, acknowledging that the trucks and equipment remained until Crown suspended PBE from the Crown Agreement).

Crown eventually suspended its agreement with PBE. According to Donahue, Crown suspended the contract "due to substandard performance by PBE on awarded [purchase orders]." (Donahue Decl. ¶ 10).

## B. Applicable Standard

Summary judgment is warranted if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. A factual issue is material only if resolving the factual issue might change the outcome of the case under the governing law. *See Clifton v. Schafer*, 969 F.2d 278, 281 (7th Cir. 1992). A factual issue is genuine only if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the evidence presented. *See Anderson*, 477 U.S. at 248. In deciding a motion for summary judgment, the court "may not 'assess the credibility of witnesses, choose between competing reasonable inferences, or balance the relative weight of conflicting evidence.'" *Bassett v. I.C. Sys., Inc.*, 715 F. Supp. 2d 803, 808 (N.D. Ill. 2010) (quoting *Stokes v.Bd. of Educ. of the City of Chi.*, 599 F.3d 617, 619 (7th Cir. 2010)). Instead, it must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in favor of the non-moving party. *See Anderson*, 477 U.S. at 255.

## C. Analysis

As discussed, the Miller Defendants move for summary judgment on all claims against them. They contend that no disputed material facts exist to warrant a trial on any of the state law claims brought against them. Each claim is addressed *seriatim*.

### a. Breach of Contract Claim (Count I)

PBE's Amended Complaint alleges that the Miller Defendants "have breached the parties' agreement by failing to provide construction services as orally agreed upon in June of 2019." (Am. Compl. ¶ 65). The essential elements of a breach of contract action are the existence of a contract, the defendant's breach thereof, and damages. *Rogier v. Am. Testing and Eng'g Corp.,* 734 N.E.2d 606, 614 (Ind. Ct. App. 2000).

> For an oral contract to exist, parties have to agree to all terms of the contract. If a party cannot demonstrate agreement on one essential term of the contract, then there is no mutual assent and no contract is formed. A meeting of the minds of the contracting parties, having the same intent, is essential to the formation of a contract. Whether a set of facts establishes a contract is a question of law.

*Kelly v. Levandoski*, 825 N.E.2d 850, 857 (Ind. Ct. App. 2005) (internal citations omitted).

The Miller Defendants argue that they are entitled to summary judgment on PBE's breach of contract claim because there was no contract; and, even if there was, PBE has no contractual damages. The Miller Defendants point to the undisputed record where both principals of PBE and PEM agree that no agreement was ever reached. They argue that the testimony of both Peters and Miller demonstrates that there was no mutual assent or a meeting of the minds between the parties. *See Bennett v. Broderick,* 858 N.E.2d 1044, 1048 (Ind. Ct. App. 2006). At most, the Miller Defendants suggest that the record supports the Court finding that the parties entered into an "agreement to agree in the future," which they argue is not a contract. *Mays v. Trump Indiana, Inc.*, 255 F.3d 351, 357–58 (7th Cir. 2001) (an agreement to agree is not a binding contract under Indiana

law). For its part, PBE argues, without much evidentiary support, that a contract existed, the Miller Defendants breached it and caused them damage.

Based on the summary judgment record before it, this Court need not dig deep into the facts to conclude that the parties failed to reach an agreement, oral or otherwise, that was sufficiently definite in its terms to be enforceable. The Miller Defendants correctly recite that contracts must demonstrate an intent to be bound and definiteness of terms to be enforceable under Indiana law. *Allen v. Clarian Health Partners, Inc.,* 980 N.E.2d 306, 309 (Ind. 2012) (citing *Conwell v. Gray Loon Outdoor Mktg. Grp., Inc.,* 906 N.E.2d 805, 813 (Ind. 2009); Restatement (Second) of Contracts § 33 (recognizing that in order to give effect to a contract, its terms must be "reasonably certain")). And here, there is simply no evidence that the parties were on the same page as to the scope or details of their arrangement.

In fact, the exact opposite appears true. For instance, both Peters and Miller testified that the discussions in May 2019 did not result in a contract. According to them, the parties were having "initial conversations" and exchanging draft emails. While the draft emails mentioned PEM receiving 90% of invoiced amounts and PBE retaining 10% of those amounts, there is no evidence that the parties ever reached a final agreement on such terms. Peters testified that "there was no agreement at that time. It was a proposal." (PBE Dep. at 40-41). Likewise, Miller testified "we never got to an agreement." (PEM Dep. at 61).

Nor do the parties' dealings with one another indicate that any final agreement had been obtained. Peters testified that he "assumed" PEM was investing money in the project in May and June 2019, but he believed the agreement was that he would receive 10% without having to do anything. (Peters Dep. at 48). Yet, Peters testified he rented fork trucks, dumpsters, fuel for trucks

and paid some employees. (*Id.* at 49). At the same time, he represents that the Miller Defendants were supposed to supply the equipment and pay the employees.

What is clear is that the parties were engaged in conversations but could not reach an agreement. They also did not want to risk PBE's contract with Crown by not moving the Crown Project along. What this suggests is that the parties agreed to continue working towards a finalized agreement, but never reached that agreement. And such an arrangement, that is, an agreement to agree later is not enforceable. *Wolvos v. Meyer*, 668 N.E.2d 671, 674 (Ind. 1996) ("The law is well established that a mere agreement to agree at some future time is not enforceable.").

That said, PBE seemingly argues that the parties had reached an agreement in May and June and the only thing left to do was reduce it to writing. PBE is correct that parties may agree to a contract which obligates them to execute a subsequent final written agreement, but nowhere is this evident in the present record:

> It is quite possible for parties to make an enforceable contract binding them to prepare and execute a subsequent final agreement. In order that such may be the effect, it is necessary that agreement shall have been expressed on all essential terms that are to be incorporated in the document. That document is understood to be a mere memorial of the agreement already reached. If the document or contract that the parties agree to make is to contain any material term that is not already agreed on, no contract has yet been made; the so-called "contract to make a contract" is not a contract at all.

*Wolvos*, 668 N.E.2d at 674–75 (Ind. 1996) (quoting 1 Arthur Linton Corbin and Joseph M. Perillo, Corbin on Contracts § 2.8 at 133–34 (rev. ed. 1993)).

Here, even if the emails, communications, and other actions showed the parties agreed to something, the record does not tell the Court what. PBE wants the Court to find a contract existed but proffers no evidence from which the agreed upon terms could be gleaned. Both Peters and Miller – the two people that matter – agreed that they never reached an agreement and that the email from

Smith was only an "initial proposal."[8] Following that email, it is clear that in May, the Miller Defendants borrowed money to pay to Smith's crews who were already working on the Crown Project, but there is no evidence as to the specifics of any payment obligation to those crews. Additionally, Peters testified he was renting trucks and other equipment and paying employees, albeit, he did so believing that it was not his responsibility. But that is merely further indication that the parties were not in agreement on even the most basic terms. Indeed, it is this absence of agreement that caused all the downline drama in July. PEM believed PBE was withholding monies received from Crown for purchase orders and not reimbursing PEM; PBE believed PEM wasn't timely paying Smith's crews. None of this was good for business. But without definite and certain terms and the parties manifesting an intent to be bound, the Court cannot possibly conclude an enforceable contract was created, what the terms were, who breached it, and whether there were damages. For this reason, the Miller Defendants are entitled to summary judgment on PBE's claim for breach of contract.

### b. Fraud (Count III) and Fraudulent Misrepresentations (Count VI)[9]

---

[8] Peters points to declarations from Dianna McFadden, a former PBE employee, and an individual named Mike Taylor as additional proof of the existence of a contract. McFadden's Declaration states that "PBE and Phillip Miller, the owner of PEM Consulting & Construction had entered into an agreement for cell site construction work in Ft. Wayne." (ECF No. 142-4, ¶ 4). Taylor's Declaration is loaded with hearsay and states, "Mr. Smith informed me that PEM Consulting Group, owner, Phillip Miller, had entered into an agreement with PBE to provide financing, equipment and vehicles for six construction crews to work on Crown Castle sites in Ft. Wayne, Indiana." (ECF No. 142-5, ¶ 3). Both declarations suffer from the same flaw, that is, the declarant has not demonstrated any basis of knowledge for their statement that a legally enforceable contract existed. Neither was involved in the negotiations and neither has any first-hand knowledge about the parties' exchange of information during that negotiating process.

[9] Aside from claims of actual fraud and fraudulent misrepresentation, PBE asserted a claim for fraud in the inducement (Count IV). "Fraudulent inducement occurs when a party is induced through fraudulent misrepresentations to enter into a contract." *Reitenour v. M/I Homes of Ind., L.P.*, 239 N.E.3d 56, No. 23A-CT-3090, 2024 WL 3085306, at *2 (Ind. Ct. App. June 21, 2024) (quoting *Am.'s Directories, Inc. v. Stellhorn One Hour Photo, Inc.*, 833 N.E.2d 1059, 1068 (Ind. Ct. App. 2005)). The elements of fraudulent inducement are no different from the elements of any action for fraud, which are: "(1) a material misrepresentation of past or existing facts; (2) made with knowledge or reckless ignorance of falsity; (3) which caused the claimant to rely upon the misrepresentation to the claimant's detriment." *Siegel v. Williams,* 818 N.E.2d 510,

Next, PBE asserts that "on July 17, 2019[,] and in email and telephone calls from July 12, 2019 to July 17, 2019, [the Miller Defendants] made material misrepresentations to PBE concerning the source of funds and equipment to complete thirty-three Crown Castle sites in Indiana," knowing those representations were false. (Am. Compl. ¶¶s 77, 78). PBE further contends that it relied on the representations to its detriment and that reliance led to loss of money paid to the Miller Defendants and to loss of its contract with Crown.

PBE's claim for fraud hinges on its belief that the Miller Defendants in July 2019 failed to disclose they were using funds and equipment supplied by Knudson rather than their own equipment and funds. To support its claim for fraud, PBE asserts that in July 2019 Miller "lied to Peters about having sufficient resources of his own to fund the Crown Project" and cites Peter's testimony:

> A.   The initial meeting was at IHOP. He told me about himself and what he had to offer.
> Q.   And what did he tell you?
> A.   He was just telling me how successful he was, how much money he had, that this would be an easy project for him, and he had the wherewithal and the knowledge to do this and the people and the equipment. It could be a good fit was my thoughts at the time.
> Q:   Did you ever ask Mr. Miller during those meetings what the source of his funds – where his funding was coming from?
> A.   He assured me it was all his money. He drove in in a brand new Audi. I remember that. He was kind of flashy. He said he worked with government stuff and was very successful; and he had the funds to do all this, because I was cautious about the outlay of funds it took to do –not cautious. I was not cautious enough. I was concerned of sometimes it takes 30 to 90 days to get cash flow on some of these things depending on the customer; and I wanted to make sure he could weather that storm, so to speak, just before things started to happen. And I wanted to make sure that the people that he was going to provide were competent and experienced, because when you go to a cell site –I don't know if you want to get into too much – you have to

---

515 (Ind. Ct. App. 2004) (citing *Jackson v. Blanchard,* 601 N.E.2d 411, 418 (Ind. Ct. App. 1992)). Because the Court finds that the parties did not reach an enforceable agreement, the Miller Defendants' motion for summary judgement on the claim for fraudulent inducement is GRANTED.

> know what you're doing when you get there or you're going to fail. You can't just go by the drawings.
>
> Q: Did you do anything else to vet Mr. Miller or his company for this project?
> A: I was pretty much relying on Chris Smith, his recommendations; and he said he worked with him. I should have done more.

(PBE Dep. at 22-23).

The Miller Defendants acknowledge that they provided trucks to Smith that had been leased by Knudson, but essentially assert that they were under no obligation to disclose this information. Even if their failure to disclose that Knudson leased the trucks was actionable, they argue that PBE cannot show that PBE suffered any injury from their failure to disclose as all trucks remained on the job sites through the summer of 2019. With respect to the funding of the project, the Miller Defendants deny that the source of funds was provided by Knudson. They point to Miller's testimony that he took a loan from his friend Ross to fund the project and the bank records showing the wire transfers from Ross to PEM in May 2019.

As an initial matter, the Court does not see any practical difference between PBE's claims for actual fraud and its claim of fraudulent misrepresentation. The elements of common law fraud require PBE to establish that the Miller Defendants made: (1) a material misrepresentation of past or existing fact which (2) was untrue, (3) was made with knowledge of or in reckless ignorance of its falsity, (4) was made with the intent to deceive, (5) was rightfully relied upon by the complaining party, and (6) which proximately caused the injury or damage of which PBE complains. *Lawyers Title Ins. Corp. v. Pokraka,* 595 N.E.2d 244, 249 (Ind. 1992). Similarly, to prevail on a fraudulent misrepresentation cause of action, PBE must prove: (1) the Miller Defendants made false statements of past or existing material facts; (2) they made such statements knowing them to be false or recklessly without knowledge as to their truth or falsity; (3) they made the statements to induce

15

PBE to act upon them; (4) PBE justifiably relied and acted upon the statements; and (5) PBE suffered injury. *See Wise v. Hays*, 943 N.E.2d 835, 840 (Ind. Ct. App. 2011).

"[F]raud is not limited only to affirmative representations; the failure to disclose all material facts can also constitute actionable fraud." *Kesling v. Hubler Nissan, Inc.*, 997 N.E.2d 327, 335 (Ind. 2013) (quoting *Lawson v. Hale*, 902 N.E.2d 267, 275 (Ind. Ct. App. 2009), *superseded by statute on other grounds*). But, in the absence of a duty to disclose, "mere silence is not actionable fraud." *First Bank of Whiting v. Schuyler*, 692 N.E.2d 1370, 1374 (Ind. Ct. App. 1998). A duty to speak arises in two primary ways: through a fiduciary relationship or through a buyer-seller relationship where one party "enjoy[s] a position of superiority over the other." *Strong v. Jackson*, 777 N.E.2d 1141, 1147 (Ind. Ct. App. 2002). Simply possessing "at least some knowledge not possessed by the other" does not immediately create a position of superiority. *Am. Heritage Banco, Inc. v. Cranston*, 928 N.E.2d 239, 247 (Ind. Ct. App. 2010).

Here, the evidence in the record fails to show that the Miller Defendants engaged in actionable fraud. First, the conversation relied upon by PBE occurred well after work on the Crown Project began in May 2019 and so nothing that Miller said in July 2019 could have been relied upon by PBE two months earlier. Smith's crews were onsite in May 2019 and PEM had already secured financing through Ross by the time the July 17, 2019, conversation occurred. Prior to that conversation, as this Court has already noted, no agreement had been reached and the party's appeared to be operating on the "hope" that a final arrangement would be reached.

Second, there is nothing in Peters' testimony that shows Miller made an affirmative misrepresentation of a *material* fact. At the time that conversation occurred, Miller had obtained funding for the project, and it clearly had provided trucks for use by Smith's crews. Likewise, Miller had paid the crews in May and June. Nowhere does Peters represent that if he had known the source

16

of the funding or that trucks were leased from Knudson, he would not have done business with the Miller Defendants or that he would have terminated the Miller Defendants ability to continue doing work on the Crown Project.

Third, to the extent that PBE asserts that the Miller Defendants did not follow through on alleged representations it did make, (*i.e.*, it did not pay crews, the trucks provided were not properly equipped, and it provided an insufficient number of trained crews), that is simply a repackaging of its breach of contract claim. (*See* ECF No. 85: "Plaintiff's fraud allegations are more akin to a breach of contract claim."). Indeed, a claimant who brings both a breach of contract and a fraud claim must prove that (1) the breaching party committed the separate and independent tort of fraud; and (2) the fraud resulted in injury distinct from that resulting from the breach. *Tobin v. Ruman,* 819 N.E.2d 78, 86 (Ind. Ct. App. 2004). While "[b]reaches of contract will almost invariably be regarded by the complaining party as oppressive, if not outright fraudulent," the claimant must nonetheless prove the independent tort. *Id.* (quoting *Epperly v. Johnson,* 734 N.E.2d 1066, 1073 (Ind. Ct. App. 2000)). Here, when reduced to its simplest form, PBE's claim is not that the Miller Defendants defrauded them. It is that they did not live up to the obligations PBE anticipated when the Miller Defendants began working on the Crown Project. This is not actionable fraud and PBE has not made any cogent argument to establish that the Miller Defendants' actions constitute the separate and independent tort of fraud.

Finally, the Court fails to view either the alleged misrepresentations or omissions to be anything more than tangential facts that are not material to the parties' arrangement. Whether the trucks were leased or owned by PEM is of little consequence since the trucks were provided. Whether the funds were loaned to PEM or obtained from outside sources is irrelevant when the funds are in their possession. None of this rises to the level of fraud, which requires an intent to

mislead and deceive – neither of which has been shown by the record. Accordingly, the Court GRANTS the Miller Defendants' Motion for Summary judgment on all the fraud related counts.

### c. Unjust Enrichment (Count V)

"Also referred to as quantum meruit or quasi-contract, unjust enrichment requires a party who has been unjustly enriched at another's expense to make restitution to the aggrieved party." *Reed v. Reid,* 980 N.E.2d 277, 296 (Ind. 2012). Under Indiana law, unjust enrichment claims have three elements: "(1) a benefit conferred upon another at the express or implied request of this other party; (2) allowing the other party to retain the benefit without restitution would be unjust; and (3) the plaintiff expected payment." *Woodruff v. Ind. Fam. & Soc. Servs. Admin.*, 964 N.E.2d 784, 791 (Ind. 2012). "Put another way, 'a plaintiff must establish that a measurable benefit has been conferred on the defendant under such circumstances that the defendant's retention of the benefit without payment would be unjust. One who labors without an expectation of payment cannot recover in quasi-contract.'" *Id.*

PBE asserts that genuine issues of material facts exist showing that the Miller Defendants were unjustly enriched by their actions. PBE devotes only two paragraphs of its 29-page response brief to this claim. It contends that the evidence shows that it paid various items that should have been the Miller Defendants' responsibility. Likewise, it notes that it paid $46,365.00 to the Miller Defendants on July 12, 2019. But it charged back that amount.[10]

The problem with all this is that PBE points to know benefit conferred upon the Miller Defendants *at their express or implied request* outside of perhaps the $46,395.00 payment that it charged back. So the record contains no evidence that the Miller Defendants received monies or

---

[10] The Miller Defendants refer to a payment of $6,000 allegedly received by PEM from PBE but Peters denied knowing anything about this payment and there is no evidence in the record that the Miller Defendants requested it.

other benefits from PBE that they requested and from which an unjust enrichment claim would flow. The Miller Defendants' Motion for Summary Judgment on the unjust enrichment claim is GRANTED.

### d.  Tortious Interference with Business Relations (Count VIII)

PBE argues that the Miller Defendants tortiously interfered with PBE's business relationship with Crown when it contacted Crown on August 24, 2019, seeking payment. Generally, the elements of tortious interference with a business relationship are: "(1) the existence of a valid relationship; (2) the defendant's knowledge of the existence of the relationship; (3) the defendant's intentional interference with that relationship; (4) the absence of justification; and (5) damages resulting from [the] defendant's wrongful interference with the relationship." *McCollough v. Noblesville Schs.*, 63 N.E.3d 334, 344 (Ind. Ct. App. 2016), *trans. denied.* To be tortious, the wrongful conduct had to involve "some independent illegal act[.]" *Brazauskas v. Fort Wayne-S. Bend Diocese, Inc.*, 796 N.E.2d 286, 291 (Ind. 2003); *Watson Rural Water Co., Inc. v. Ind. Cities Water Corp.,* 540 N.E.2d 131, 139 (Ind.Ct.App.1989) ("In the State of Indiana, an element necessary to prove this cause of action is that a defendant acted illegally in achieving his end."),

PBE devotes even less paper to defending this claim. For its part, the Miller Defendants take issue with three prongs of the elements above – justification, damages, and illegal act. The Miller Defendants argue that they were justified in going to Crown to request payment when it believed that PBE was receiving payments from Crown and not paying PBE. They point out that there is no evidence that they represented themselves as a subcontractor to Crown but did seek payment for services it rendered. As far as the Court can tell, the parties provide no evidence from anyone at Crown showing that the Miller Defendants misrepresented their role in the Crown Project. In fact, even Peters had no information that the Miller Defendants claimed to Crown they were

subcontracting on the Crown Project. (PBE Dep. at 63-64: "I wasn't privy to the actual communications with Crown."). As for damages, the Miller Defendants point to the statement from Crown project manager Donaldson who submitted a declaration that states that PBE was removed from the Crown Project for "substandard performance" on the awarded purchase orders not because of any action by the Miller Defendants. (Donahue Decl. ¶ 10). Finally, the Miller Defendants argue that there is no proof that they engaged in any illegal conduct.

Taking these arguments in reverse order, PBE correctly argues that if the Miller Defendants committed fraud, that would satisfy the "illegal conduct" requirement. *See Reginald Martin Agency, Inc. v. Conseco Medical Ins. Co*., 478 F.Supp.2d 1076, 1089 (S.D.Ind. 2007) ("CMIC must have acted illegally-and fraud is a sufficient illegal act-in its interference with Plaintiffs' business relationships."). But the Court sees no genuine issue of fact that the Miller Defendants committed fraud. It is unclear whether PBE is trying to tie in its fraud claims in its earlier counts or whether it contends that the Miller Defendants committed new fraud by misrepresenting its status to Crown. Either way, however, the claim fails because PBE fails to demonstrate a genuine issue of fact that the Miller Defendants committed fraud at all.

If that were not enough, the Miller Defendants were under no duty not to speak with Crown. To be unjustified, the Miller Defendants' actions must "be malicious and exclusively directed to the injury and damage of another." *Morgan Asset Holding Corp. v. CoBank, ACB,* 736 N.E.2d 1268, 1272 (Ind. Ct. App. 2000). The Miller Defendants' actions simply do not fit this definition. Nor is there a genuine issue of fact as to damages. True, PBE lost the Crown contract. True, it lost the contract at some point after the Miller Defendants contacted Crown. Although PBE wants the Court to imply that the reason for PBE's suspension by Crown was because it engaged a subcontractor outside its contract with Crown, even a generous reading of the record simply does not support this

conclusion. What the Court is missing is any genuine issue of fact tying those two truths to the Miller Defendants' contact with Crown.

For all these reasons, the Defendants are entitled to summary judgment on PBE's claim for tortious interference with business relations.

### e.  Negligent Misrepresentation (Count VII)

PBE also brings a claim for negligent misrepresentation. Indiana has adopted the definition of "negligent misrepresentation" contained in the Restatement (Second) of Torts § 552(1), which provides that:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

*U.S. Bank N.A. v. Integrity Lane Title Corp.*, 929 N.E.2d 742, 747 (Ind. 2010). Historically, Indiana courts recognized the tort of negligent misrepresentation narrowly, in the limited context of an employer-employee relationship. *See Perfect Barrier, LLC v. WoodSmart Solution, Inc.*, 2008 WL 4449560 (N.D. Ind. Sept. 26, 2008) (citing *Eby v. York Division, Borg-Warner*, 455 N.E.2d 623, 629-30 (Ind. Ct. App. 1983)) (stating that Indiana courts have declined to recognize the tort of negligent misrepresentation beyond the context of an employer-employee relationship.). However, the tort recently has been expanded to include those whose profession includes the giving of opinions. *See Troth v. Warfield*, 495 F. Supp. 3d 729, 743 (N.D. Ind. Oct. 20, 2020).

The Miller Defendants move for summary judgment on this claim contending that Indiana law has not extended claims for negligent misrepresentation to claims like the one raised here. This Court agrees. In *Troth,* District Judge Jon DeGuilio, this Court's respected colleague, thoroughly

discussed the state of Indiana law involving claims of negligent misrepresentation. The Court includes the relevant discussion and incorporates it here:

> For decades, the tort was limited to the employer-employee relationship, *Eby v. York-Division, Borg-Warner*, 455 N.E.2d 623 (Ind. Ct. App. 1983); *Trytko*, 28 F.3d at 721 (observing "Indiana courts have declined to extend [negligent misrepresentation] beyond the employment context"), but it has recently been expanded to include those whose profession includes the giving of opinions. *See Integrity*, 929 N.E.2d at 747; *Jeffrey v. Methodist Hosps.*, 956 N.E.2d 151, 156 n.7 (Ind. Ct. App. 2011). The class of professionals who could be subject to a negligent misrepresentation claim includes, but is not limited to, "brokers, attorneys, abstractors, and surveyors." *Jeffrey*, 956 N.E.2d at 156 n.7 (declining to limit the class of professionals to brokers, attorneys, abstractors, and surveyors).

> The Indiana Supreme Court's most recent statement on this area of the law was in *U.S. Bank, N.A. v. Integrity Land Title Corp.*, 929 N.E.2d 742 (Ind. 2010). There the Court attempted to quell some of the chaos surrounding this cause of action. Relying on a number of factors outlined in the *Restatement (Third) of Economic Torts and Related Wrongs* § 9, cmt. f (Council Draft No. 2, 2007), the Court determined the tort of negligent misrepresentation could be extended to create a duty for title insurers to communicate the state of a title accurately. *See Integrity*, 929 N.E.2d at 748-49. The factors relevant to the Court's decision included that title commitments are normally relied upon by insureds; that there was an advisory relationship between the defendant and the plaintiff, that the defendant had superior knowledge and was in the business of providing such knowledge, and that the information was provided in response to a specific request and designed to guide the plaintiff in making a decision. *Id.*

> Since the *Integrity* decision, there has been limited discussion from the Indiana courts concerning the impact of the *Integrity* decision; however, the Indiana Court of Appeals has signaled further growth. *Jeffrey*, 956 N.E.2d at 157. In *Jeffrey*, the court found Indiana law did not foreclose a claim of negligent misrepresentation against a hospital. In *Jeffrey*, the plaintiffs sought to adopt a child, but would only do so if the child had no signs of significant health issues. *Id.* at 153. The plaintiffs relied on the hospital's social worker and nurse for information about the child's health. *Id.* It was later discovered the child had medical complications that were known by the hospital, but undisclosed to plaintiffs, at the time of the adoption. *Id.* at 154. Relying on the factors outlined in *Integrity*, the court could not say "that an action for negligent misrepresentation was, as a matter of law, unavailable to the [plaintiffs]" against the hospital. *Id.* at 156-57 (citing *Integrity*, 929 N.E.2d at 750).

> Despite Indiana's development in this area of law, some federal courts applying Indiana law have been tentative to push this expansion past those claims traditionally recognized. *Compare Origin Healthcare Solutions LLC*, 2014 WL 6750042 (declining to expand negligent misrepresentation to a sales

representative), *and Samaron Corp. v. United of Omaha Life Ins. Co.*, 2014 WL 4906314, at *13 (N.D. Ind. Sept. 29, 2014) (declining to expand negligent misrepresentation to an insurer because it is not the court's role "to expand upon the availability of tort remedies that Indiana has made clear are to be very limited in scope"), *with Technicolor USA, Inc. v. Nat'l Union Fire Ins. Co.*, 2019 WL 2106681, at *4 (S.D. Ind. May 14, 2019) (finding Indiana law did not definitively foreclose plaintiff's claim of negligent misrepresentation against insurer for purposes of assessing fraudulent joinder, but withholding judgment as to whether Indiana law would recognize the claim under the circumstances presented), *and Harrison Mfg., LLC v. Bienias*, 2013 WL 6486668, at *6 (S.D. Ind. Dec. 10, 2013) (applying Indiana negligent misrepresentation to a professional broker).

*Troth*, 495 F. Supp. 3d at 743–44.

Although Indiana has shown some expansion in this cause of action, the facts of PBE's claim simply are not comparable to the types of claims for which the doctrine has been expanded. As *Troth* explained, the class of individuals for whom Indiana intends this cause of action to apply involve individuals who engage in advisory roles or provide opinion-based advice. That sort of relationship has not been alleged here and PBE has not made any cogent argument that examines Indiana law on this cause of action. Accordingly, the Court declines to extend the tort of negligent misrepresentation to include the situation here and the Miller Defendants' motion for summary judgment is GRANTED on Count VII.

### f.   Individual Liability Against Miller

PBE also attempts to pierce the corporate veil and hold Miller personally liable for all the above torts and for the breach of contract. Because the Court has granted summary judgment on all claims against the Miller Defendants, it is likewise GRANTED as to the individual claims against Miller.

### g.   Insurer Liability for Breach of Contract

PBE's amended complaint asserted claims for breach of contract against the general liability insurers for PEM. It sought declaratory relief finding that the Insurers owed coverage and

indemnification obligations for the claims PBE brought against their insureds. (Am. Compl. ¶¶s 70, 71). Both Insurers have filed dispositive motions seeking to dismiss PBE's claims. (ECF No. 125, Chesapeake's Motion to Dismiss or Alternatively, Motion for Summary Judgment; ECF No. 127, Atlantic's Motion for Judgment on the Pleadings).[11] Because this Court has granted summary judgment in favor of the Miller Defendants, there are no claims remaining for which the Insurers could owe a coverage or indemnification duty under their insurance contracts with PEM. Accordingly, the Court DENIES their motions as MOOT but *sua sponte* GRANTS summary judgment in their favor on Count II of the Amended Complaint.

## CONCLUSION

Based on the above, the Court GRANTS the Miller Defendants' Motion for Summary Judgment (ECF No. 128). The Court DENIES as MOOT the Insurer's Motions at ECF Nos. 125 and 127. The Court *sua sponte* GRANTS summary judgment in favor of the Insurers on Count II of the Amended Complaint. The Clerk is DIRECTED to enter judgment in favor of all Defendants and against PBE.

SO ORDERED on March 24, 2025.

s/ Holly A. Brady
CHIEF JUDGE HOLLY A. BRADY
UNITED STATES DISTRICT COURT

---

[11] This Court referred Chesapeake's Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(2) for lack of personal jurisdiction and alternatively, for summary judgment to the Magistrate Judge for a Report and Recommendation ("R & R"). (ECF No. 162). The Magistrate Judge entered her R & R on February 28, 2025, (ECF No. 173) and PBE filed its objection to the R & R within the objection period in Fed. R. Civ. P. 72. The R & R recommends dismissal for lack of personal jurisdiction. However, because the Court concludes that no claims survive for which coverage would flow even if personal jurisdiction existed, Chesapeake's Motion to Dismiss, or in the alternative, for summary judgment is rendered moot.